**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **NO. CR 04-1433 RB** |
| | ) | |
| | ) | |
| JOSE NAVIDAD VALENZUELA-PUENTES, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

　　　**THIS MATTER** came before the Court on remand from the Tenth Circuit Court of Appeals for "appli[cation of] the clear and convincing test in determining whether it is constitutionally permissible for the government to forcibly medicate Mr. Valenzuela-Puentes, and specific[ ] consider[ation of] the impact of Mr. Valenzuela-Puentes' extremely low intelligence and the deep entrenchment of his delusional thought patterns and beliefs on the likelihood that medicating him will render him competent to stand trial." *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1229 (10th Cir. 2007). On May 3, 2007, I held a status conference and requested that counsel file proposed findings of fact and conclusions of law. Having considered the submissions of counsel, the record on appeal[1], and opinion of the Tenth Circuit, and being otherwise fully advised, I issue these findings of fact and conclusions of law.

---

　　　[1]　 Counsel represented and agreed at the May 3, 2007 status conference that no additional evidence was necessary. Contrary to its representations, the government referred to a forensic evaluation report of Dr. Jean Zurla, dated February 15, 2006, in its proposed findings of fact. The government did not submit the February 15, 2006 report to the Court. The government's proposed findings concerning evaluations performed after September 27, 2004 and the February 15, 2006 report are not considered herein.

**Findings of Fact**

1.        Mr. Valenzuela-Puentes was arrested on August 5, 2003, and charged with reentering the United States after being deported following a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326 (a)(1) and 8 U.S.C. § 1326 (b)(2).  (Doc. 1.)  After her appointment to represent Mr. Valenzuela-Puentes, Ms. Roseanne Camuñez moved for a competency evaluation.  (Doc. 7.) United States Magistrate Judge Lourdes A. Martinez granted the motion and ordered a psychiatric examination to determine whether Mr. Valenzuela-Puentes was competent to stand trial.  (Doc. 8.)

2.        On October 2, 2003, Dr. Juan N. Sosa, a licensed clinical psychologist, performed a psychological evaluation of Mr. Valenzuela-Puentes at the Doña Ana County Detention Center. (Sosa Report at 2.)  Mr. Valenzuela-Puentes reported he was born in Mexico, but he had been granted dual citizenship and the right to be a United States Marshal with worldwide jurisdiction. (*Id.*)  When asked about his duties, Mr. Valenzuela-Puentes responded "he is supposed to run and hide all over the world." (*Id.*)  Mr. Valenzuela-Puentes believed he was incarcerated because the United States wanted to remove his right to operate as an agent.  (*Id.*)

3.        Dr. Sosa measured Mr. Valenzuela-Puentes' non-verbal IQ at 73 and his verbal IQ at 76.  (Sosa Report at 3.)  These scores placed Mr. Valenzuela-Puentes in the "borderline defective range" of intelligence.  (*Id.*)  Dr. Sosa found that Mr. Valenzuela-Puentes was in a state of chronic and substantial stimulus overload and at risk for becoming psychologically incapacitated.  (*Id.*)  Dr. Sosa concluded that Mr. Valenzuela-Puentes was incompetent to stand trial and his amenability to treatment was questionable due to his low level of intellect.  (Sosa Report at 4.)  Dr. Sosa diagnosed delusional disorder, mixed type, possible learning disability, borderline intelligence, and paranoid personality disorder.  (*Id.*)

4.        On November 14, 2003, United States Magistrate Judge Leslie C. Smith held a

competency hearing.   (Doc. 10.) After counsel stipulated that Mr. Valenzuela-Puentes was incompetent to stand trial, Judge Smith ordered Mr. Valenzuela-Puentes to undergo a psychiatric evaluation at a medical center for federal prisoners, pursuant to 18 U.S.C. § 4241(d).

5.       In January 2004, Mr. Valenzuela-Puentes was transferred to the mental health department of the federal medical center in Butner, North Carolina, where he was evaluated by board-certified staff psychiatrist Dr. Bruce P. Capehart, psychologist Dr. Carlton Pyant and psychological intern Candyce Shields. (Capehart Report at 1-2.)  The four-week evaluation period included interviews, observations, and the administration of psychological and medical testing.  (*Id*; Tr. at18.)  Dr. Capehart issued a report on March 8, 2004.  (*Id*. at 1.)

6.       A physical examination was unremarkable, as were a brain MRI scan and EEG. (Capehart Report at 5.)  Mr. Valenzuela-Puentes was calm, alert, and appropriate throughout the evaluation period.  (*Id*. at 7.)  Mr. Valenzuela-Puentes did not require any assistance with daily living activities, maintained good room and personal hygiene, and acted appropriately with staff and other inmates.  (*Id*.)  Mr. Valenzuela-Puentes was compliant with institutional rules and did not present any management difficulties.  (*Id*.)

7.       Mr. Valenzuela-Puentes reported he was a "General" in the Mexican army and he was employed as "a federal runner and U.S. Marshal."  (Capehart Report at 4.)  Mr. Valenzuela-Puentes maintained he could not be facing immigration charges due to his status as a "federal runner" and the fact the United States has been incorporated into a new country called the "United States of Mexico," of which he is a citizen.  (*Id*.)

8.       Mr. Valenzuela-Puentes was assessed with a non-verbal IQ of 66, which placed him in the lowest percentile of the population.  (Capehart Report at 8; Tr. at 20.)  The personality assessment test results were invalid, suggesting that Mr. Valenzuela-Puentes approached the test in

a defensive manner and under reported symptoms in an effort to appear mentally healthy.  (Capehart

Report at 9.)  The validity score scale configuration suggested confusion that may be "organic or

functional in nature."  (*Id*.)

9.      Dr. Capehart diagnosed psychotic disorder, not otherwise specified, and noted Mr.

Valenzuela-Puentes  had  no  insight  into  his  condition.    (Capehart  Report  at  9-10.)    Mr.

Valenzuela-Puentes was advised of the diagnosis and the recommended treatment, but he refused

medication. (Capehart Report at 7.)  Mr. Valenzuela-Puentes stated a federal judge could not order

him  to  take  medication  because,  "[he  was]  the  federal  government,"  but  said  he  would  take

medication if it was placed in the food for all inmates at the institution.  (*Id*.)

10.      Dr. Capehart opined that Mr. Valenzuela-Puentes was not competent to stand trial

and was substantially unlikely to attain competency without antipsychotic medication.  (*Id*. at 10.)

According to Dr. Capehart, antipsychotic medication was likely to render Mr. Valenzuela-Puentes

competent to stand trial and that less intrusive treatments were unlikely to achieve substantially the

same result given Mr. Valenzuela-Puentes' lack of insight regarding his illness. (*Id*. at 11-12.)

While Dr. Capehart acknowledged that some individuals experience "significant" side effects from

the medication, such side effects are routinely managed and the available information offered no

indication that Mr. Valenzuela-Puentes would suffer serious side effects with proper prescription

and monitoring.  (*Id*. at 11-12.)

11.      Following receipt of Dr. Capehart's report, the government moved for an order

permitting involuntary medication in order to render Mr. Valenzuela-Puentes competent to stand

trial, pursuant to *Sell v. United States,* 539 U.S. 166 (2003).  A hearing was held on September 27,

2004, at which Dr. Capehart, Dr. Sosa, and Dr. Abraham Fiszbein testified as expert witnesses.

12.      At the hearing, Dr. Capehart testified that he performs psychiatric evaluations and

treatment for inmates at the Butner federal medical center and the bulk of his treatment is medication-based.  (Tr. at 14-15.)  Dr. Capehart carries a caseload of 50 to 60 patients, half of whom require pretrial forensic evaluations and treatment for restoration of competency.  (Tr. at 16.)

13.     Dr. Capehart testified that Mr. Valenzuela-Puentes could be treated with orally-administered drugs that generally cause very few side effects.  (Tr. at 23)  Dr. Capehart acknowledged there was "always a chance that any medication with any individual could cause a side effect that is not commonly seen." (Tr. at 26.)  The medication would not have a large impact on Mr. Valenzuela-Puentes' cognitive function and Mr. Valenzuela-Puentes could be educated about the legal system if his psychotic symptoms were eliminated.  (Tr. at 28.)

14.     On cross-examination, Dr. Capehart testified that he was unable to come to a definitive diagnosis due to lack of information about Mr. Valenzuela-Puentes's past history.  (Tr. at 38.)  Dr. Capehart acknowledged that the proposed medications could have serious side effects and that information concerning the patient's history would be helpful in assessing the risk of side effects.  (*Id.*)

15.     Dr. Sosa testified that he has been a licensed psychologist since 1977 and has performed court ordered psychiatric evaluations for the past 10-12 years.  (Tr. at 56-57.)  Dr. Sosa questioned whether Mr. Valenzuela-Puentes was amenable to treatment due to Mr. Valenzuela-Puentes's low-level of intellectual functioning.  (Tr. at 61-62.)  Dr. Sosa testified that Mr. Valenzuela-Puentes' "belief system that is very well ingrained" and that "[Mr. Valenzuela-Puentes] thinks the way he thinks, and that will never go away . . . I don't care what medication you use." (Tr. at 62-63.)

16.     When asked by defense counsel whether he believed that medicating Mr. Valenzuela-Puentes would restore his competency, Dr. Sosa relied "I don't think there is a basic

competence" because "[h]is belief system is too well ingrained, and he doesn't have the cognitive skills and the upper level functioning, the executive functioning in the brain . . .." (Tr. at 64.)  Dr. Sosa testified that the medication proposed by Dr. Capehart was dangerous and would not restore Mr. Valenzuela-Puentes to competency.  (*Id*.)

17.     On cross-examination, Dr. Sosa stated that, even if Mr. Valenzuela-Puentes were medicated, Mr. Valenzuela-Puentes' poor cognition would still prevent him from "totally comprehend[ing] what is happening to him."  (Tr. at 69.)  Dr. Sosa continued, "I don't think his character disorder and his ideas and his psychotic system [are] going to function any better than [they are] now with any kind of medication.  That's my opinion from experience over the last 40 years with knowing those people."  *Id.*

18.     Dr. Fiszbein is a licenced psychiatrist in private practice in Las Cruces, New Mexico. (Tr. at 72.)  Although Dr. Fiszbein did not examine Mr. Valenzuela-Puentes, Dr. Fiszbein is familiar with antipsychotic medications in that he routinely prescribes them and participated in the development of a rating scale used by pharmaceutical companies to measure the efficacy of such medications. (Tr. at 73).  Unexpected reactions to antipsychotic medications include diabetic coma, liver damage, mania, and paradoxical effects, which are the opposite of the desired result.  (Tr. at 75-77.)

19.     According to Dr. Fiszbein, about twenty percent of people do not respond to antipsychotic medication.  (Tr. at 79.)  Dr. Fiszbein testified that the kind of delusional thinking displayed by Mr. Valenzuela-Puentes "can be very resistant" to treatment through medication and that the likelihood of success further decreases if the patient is older than forty, as is Mr. Valenzuela-Puentes.  (Tr. at 79-80.)

20.     Dr. Fiszbein further testified that the brains of patients with low intellectual function

6

are more sensitive to medication and that "giving them regular doses could cause something that is almost like being intoxicated with medication," a condition known as "akathisia." (Tr. at 81.)  Even low doses can make such persons "very agitated, irritable, explosive, and potentially dangerous." (*Id*.)  While Dr. Fiszbein did not testify as to the likelihood that Mr. Valenzuela-Puentes would suffer from akathisia, his testimony raises the possibility that intoxication with medication could further compromise Mr. Valenzuela-Puentes' competency and his ability to assist his attorney in preparing his defense.  (*Id*.)

### Conclusions of Law

1.      Mr. Valenzuela-Puentes "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."  *Washington v. Harper,* 494 U.S. 210, 221-22 (1990). "[A]n individual has a constitutionally protected liberty interest [under the Due Process Clause] in avoiding involuntary administration of antipsychotic drugs - an interest that only an essential or overriding state interest might overcome." *Sell,* 539 U.S. at 178-79.  Instances of involuntary medication of a non-dangerous defendant solely to render him competent to stand trial should be "rare" and occur only in "limited circumstances."  *Id*. 539 U.S. at 169, 180,

2.      In order to determine whether to involuntarily medicate a non-dangerous defendant, such as Mr. Valenzuela-Puentes:

> First, [the] court must find that *important* governmental interests are at stake . . ..
> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests . . .. Third, the court must conclude that involuntary medication is *necessary* to further those interests . . .. [And f]ourth, . . . the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best interest in light of his medical condition.

*Valenzuela-Puentes*, 479 F.3d at 1224-25 (quoting *Sell*, 539 U.S. at 180-81 (emphasis in original)).

7

3.        Given "the vital constitutional liberty at stake, the government must prove all necessary facts by "clear and convincing evidence." *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005).  The government establishes a fact by clear and convincing evidence only if the evidence "places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." *Valenzuela-Puentes*, 479 F.3d 1228 (internal quotations omitted).

4.        The Tenth Circuit affirmed my decision on the first prong of *Sell* and concluded that the government has an important interest in prosecuting Mr. Valenzuela-Puentes.  *Valenzuela-Puentes*, 479 F.3d 1227.

5.        The Tenth Circuit remanded on the second *Sell* prong; whether involuntary medication will "*significantly further*" the government's interest in prosecuting Mr. Valenzuela-Puentes.  *Valenzuela-Puentes*, 479 F.3d 1227 (quoting *Sell*, 539 U.S. at 181) (emphasis in original).  This determination entails two findings; whether "administration of the drugs is *substantially likely* to render the defendant competent to stand trial" and whether "administration of the drugs is *substantially unlikely* to have side effects that interfere significantly with the defendant's ability to assist counsel in conducting a trial defense."  *Id.* (quoting *Sell*, 539 U.S. at 181) (emphasis supplied by Tenth Circuit).  "[O]nly in the event the district court determined that the government has proved these two factors by clear and convincing evidence may it conclude that involuntary medication will *significantly further* the government's interest."  *Id.* (emphasis in original).

6.        The government failed to establish by clear and convincing evidence that administration of the drugs is substantially likely to render Mr. Valenzuela-Puentes competent to stand trial.  Dr. Capehart testified that the medication would not have a large impact on Mr. Valenzuela-Puentes' cognitive function; yet Mr. Valenzuela-Puentes could be educated about the legal system if his psychotic symptoms were eliminated.  Dr. Capehart did not explain how Mr.

8

Valenzuela-Puentes could be educated in light of Mr. Valenzuela-Puentes' deeply ingrained belief system and poor cognition.  Dr. Sosa testified that Mr. Valenzuela-Puentes does not have the cognitive skills and the upper level functioning to attain competency even if his delusions are held at bay.  The government failed to establish by clear and convincing evidence that administration of the drugs is substantially likely to render Mr. Valenzuela-Puentes competent to stand trial.

7.      The government failed to establish by clear and convincing evidence that administration of the drugs is substantially unlikely to have side effects that interfere significantly with Mr. Valenzuela-Puentes' ability to assist counsel in conducting a trial defense.  Dr. Capehart testified that the drugs generally cause very few side effects, but he acknowledged there was a chance the medication could cause unforeseen side effects.  Dr. Sosa testified that the medication was dangerous.  Dr. Fiszbein testified that unexpected reactions to antipsychotic medications include diabetic coma, liver damage, mania, and paradoxical effects.  According to Dr. Fiszbein, the kind of delusional thinking displayed by Mr. Valenzuela-Puentes can be very resistant to medication and that the likelihood of success further decreases if the patient is older than forty, as is Mr. Valenzuela-Puentes.  While Dr. Fiszbein did not testify as to the likelihood that Mr. Valenzuela-Puentes would suffer from akathisia, his testimony raises the possibility that intoxication with medication could further compromise Mr. Valenzuela-Puentes' competency and his ability to assist his attorney in preparing his defense.  The government failed to establish by clear and convincing evidence that administration of the drugs is substantially unlikely to have side effects that interfere significantly with Mr. Valenzuela-Puentes' ability to assist counsel in conducting a trial defense.

8.       In light of Mr. Valenzuela-Puentes' extremely low intelligence and the deep entrenchment of his delusional thought patterns and beliefs it is unlikely that forced medication will

render him competent to stand trial.  Involuntary medication will not significantly further the government's interest in prosecuting Mr. Valenzuela-Puentes.

9.      It is constitutionally impermissible for the government to forcibly medicate Mr. Valenzuela-Puentes.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**